# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE QUILTEX COMPANY, INC., on behalf of itself and all others similarly situated, | **08 CV 0444** |
| Plaintiff, | Civil Action No. |
| | CLASS ACTION COMPLAINT |
| vs. | |
| WILLIAM PRYM GMBH & CO., KG; PRYM CONSUMER USA, INC.; PRYM FASHION, INC.; COATS PLC; COATS NORTH AMERICA DE REPUBLICA DOMINICANA, INC.; YKK CORPORATION; YKK CORPORATION OF AMERICA, INC.; YKK (U.S.A.) INC.; YKK SNAP FASTENERS AMERICA, INC.; and SCOVILL FASTENERS, INC. | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff, The Quiltex Company, Inc., brings this action for damages and injunctive relief for price fixing and market and customer allocation under Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1, and the antitrust laws of the United States against the manufacturers of fasteners and zippers for the apparel industry named above, which participated in an overarching, on-going, international conspiracy and cartel beginning in 1977 and continuing to date. Based upon personal knowledge, information and belief, the investigation of counsel, and upon the admissions of three defendants, plaintiff, The Quiltex Company, Inc., alleges as follows:

## NATURE OF THE ACTION

1.      This case arises out of a long-running, international conspiracy among defendants and their co-conspirators to fix the prices of, and allocate customers and geographic territories for, fasteners, zippers, snaps, hooks & eyes, rivets, eyelets and similar fastening devices (excluding needles) that affix two or more objects together, hereafter collectively referred to as

"Fasteners and Zippers." Fasteners and Zippers are used primarily in the garment, apparel and footwear industries for the manufacture of clothes and shoes.

2.    This case is brought as a class action on behalf of all persons and entities who, from at least as early as 1977 and continuing to date (hereinafter, the "Class Period"), purchased Fasteners and Zippers directly from one or more defendants and/or their co-conspirators.

3.    During the Class Period, and possibly earlier, defendants conspired to fix, raise, maintain and/or stabilize prices of, and to allocate customers and geographic markets in the worldwide market for Fasteners and Zippers.

4.    As alleged herein, defendants agreed with each other on coordinated price increases, fixed minimum prices, allocation of customers, sharing of markets and exchanging other commercially important and confidential information.

5.    As a direct and proximate result of defendants' unlawful, price-fixing, market and customer allocation conspiracy, plaintiff and the members of the Class (defined below) have paid artificially high prices for Fasteners and Zippers than they would have paid in a competitive market, and therefore, have suffered injury to their respective businesses and property.

6.    During the period relevant to this Complaint, plaintiff has been a direct purchaser of Fasteners and Zippers from one or more of the defendants.  Plaintiff brings this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages, and the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

## PLAINTIFF

7.    Plaintiff The Quiltex Company, Inc. is a corporation duly organized and existing under the laws of the State of New York, with a principal place of business located at 112 West

34th Street, New York, New York 10001. The Quiltex Company, Inc. manufactured infant

bedding and quilts. During the Class Period, The Quiltex Company, Inc. purchased Fasteners

and/or Zippers directly from one or more of the defendants.

8.    The prices The Quiltex Company, Inc. paid to defendants for Fasteners and

Zippers were greater than the prices The Quiltex Company, Inc.would have paid absent the

conspiracy alleged herein. The Quiltex Company, Inc. has therefore been injured in its business

and property by reason of defendants' antitrust violations. The Quiltex Company, Inc. asserts its

claims on behalf of itself and all direct purchasers who, during the Class Period, purchased

Fasteners and Zippers from one or more of the defendants.

## DEFENDANTS

### The Prym Group Defendants

9.    Defendant William Prym GmbH & Co. KG is a company established under the

laws of Germany with its principal place of business located at Zweifaller Strabe 130, D-52224

Stolberg, Germany. The Prym Group claims to be the oldest family-owned business in

Germany, having been founded in 1530. In 1924, Hans August Prym established William Prym,

Inc. U.S.A. in New York City as the exclusive U.S. importer and sales agent for the company.

William Prym GmbH & Co. KG is made up of three divisions, with sales offices and production

facilities located in over 60 countries and operating in every major market worldwide. The three

divisions are Prym Consumer, Prym Fashion and Inovan. Prym Consumer is a leading global

supplier of sewing products and needlework, as well as fashion accessories, and fasteners such as

snaps, buttons, eyelets, buckles, hooks & eyes and snap attacher tools. Prym Fashion offers

fastening solutions for clothes and fastening systems for the garment, leather and textile

industries, including press fasteners, zips, jean buttons and rivets, eyelets and washers for every

application, as well as attaching technology, pneumatic presses, semi and fully automatic

3

machines. Inovan provides innovative solutions in the fields of material and surface technology, as well as fasteners and precision mechanical parts. During the Class Period, William Prym GmbH & Co. KG manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States and the world, either directly or through its affiliated companies.

10.     Defendant Prym Consumer USA, Inc.  ("Prym USA") is a part of the Prym Consumer Group and a South Carolina corporation with its principal place of business located at 950 Brisack Road, Spartanburg, SC 29303. Prior to 2005, Prym USA was known as the Prym Dritz Corporation. Prym USA is a wholly-owned and controlled subsidiary of a U.S. holding company William Prym, Inc., which is in turn a wholly-owned and controlled subsidiary of William Prym GmbH & Co. KG. Prym USA is the largest manufacturer and distributor of sewing, quilting and craft-related notions in North America, selling to retailers in the United States under the Dritz® and Prym Sewing™ brands. During the Class Period, Prym USA directly manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States.

11.     Prym Fashion, Inc. is a part of the Prym Fashion Group and a South Carolina corporation with its principal place of business located at 950 Brisack Road, Spartanburg, SC 29303. Prym Fashion, Inc. is a wholly owned and controlled subsidiary of Prym Inovan GmbH Co. KG of Stolberg, Germany, which is in turn, a wholly-owned and controlled subsidiary of William Prym GmbH & Co. KG. Prym Fashion, Inc. sells under the brands Prym, Fiocchi and Eclair Prym. During the Class Period, Prym Fashion, Inc. directly manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States.

4

12.    Defendants William Prym GmbH & Co. KG, Prym Consumer USA, Inc. and Prym Fashion, Inc., together with numerous other subsidiaries not named as defendants here, are collectively referred to herein as "the Prym Group."

**The YKK Group Defendants**

13.    Defendant YKK Corporation is a corporation established under the laws of Japan with its principal place of business located at 1, Kanda Izumi-cho, Chiyoda-ku, Tokyo 101-8642, Japan. The 119 affiliated companies of the YKK Corporation operate in 70 countries throughout the world. The YKK Corporation, founded in 1934, functions both as the Group headquarters and as a business entity, whose main businesses are the "Fastening Products Group" and the "Machinery and Engineering Group." YKK Corporation opened its first United States office in New York in 1960. The YKK Corporation is the largest manufacturer of zippers in the world with 50% of the worldwide market share. The YKK Group counts multinational clothing companies Levi Strauss, Adidas and Nike as global clients. During the Class Period, the YKK Corporation manufactured, sold and/or distributed Fasteners and Zippers under the YKK® brand to customers throughout the United States and the world, either directly or through its affiliated companies.

14.    Defendant YKK Corporation of America, Inc. is a New York corporation with its principal places of business located at One Parkway Center, 1850 Parkway Place, Suite 300, Marietta, Georgia 30067 and 301 Route 17 North, Suite 503, Rutherford, New Jersey 07070. YKK Corporation of America is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. YKK Corporation of America, Inc. is the YKK Group's Western Hemisphere parent. During the Class Period, YKK Corporation of America manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States and the Western Hemisphere, either directly or through its affiliated companies.

15.    Defendant YKK (U.S.A.) Inc. is a New York corporation with its principal place of business located at 1300 Cobb Industrial Drive, Marietta, Georgia 30066. YKK (U.S.A.) Inc. is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. YKK (U.S.A.) Inc. operates the Fastening Products Group in the United States, with sales and service offices located in Rutherford, New Jersey; New York, New York; Anaheim, California; Renton, Washington; Addison, Texas; El Paso, Texas; and Glenview, Illinois. YKK (USA) Inc. is the largest zipper producer in the United States with over 1000 styles and colors. During the Class Period, YKK (U.S.A.) Inc. manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States, either directly or through its affiliated companies.

16.    Defendant YKK Snap Fasteners America, Inc. is a Delaware corporation with its principal place of business located at 302 Factory Avenue, Lawrenceburg, Kentucky 40342, and with manufacturing plants located at 1090 Industry Road, Lawrenceburg, Kentucky 40342 and 200 Universal Drive, Centerville, Tennessee 37033. YKK Snap Fasteners America, Inc. is a part of the Fastening Products Group and operates sales offices in El Paso, Texas and New York, New York. YKK Snap Fasteners America, Inc. is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. Founded in 1895, predecessors of YKK Snap Fasteners America, Inc. have been making Fasteners and Zippers in the United States for more than 100 years, joining forces in 1987 with YKK Corporation, the world's foremost zipper manufacturer. During the Class Period, YKK Snap Fasteners America, Inc. manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States, either directly or through its affiliated companies.

6

17.     YKK Group brands and trademarks sold in the United States include Vislon®, YZip®, Ever Bright®, Excella®, Eflon®, Flat Knit™, PowerHook™, Metallion®, Conceal®, AquaGuard®, Lumifine®, CyberlocTM, Crystalloc™, HammerlocTM, Locwave™, Spacedome™, Shockonloc™, Zipcap™, L-Type®, Locwave™, and Prifa®

18.     Defendants YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc. and YKK Snap Fasteners America, Inc., together with the numerous other subsidiaries of the YKK Corporation not named as defendants here, are collectively referred to herein as "the YKK Group."

## The Coats Group Defendants

19.     Defendant Coats plc is a corporation established under the laws of the United Kingdom with its principal place of business located at 1 The Square, Stockley Park, Uxbridge, Middlesex, UB I 1 ITD, United Kingdom.  Coats was founded in 1755 and listed on the London Stock Exchange in 1890.  Since April 2004, Guinness Peat Group plc has owned 100% of the ordinary shares in Coats Group Limited, which in turn owns 100% of the ordinary shares in Coats plc. When Guinness Peat Group plc acquired a partial interest in Coats plc in 2003, Coats plc's shares were de-listed from the London Stock Exchange.  Coats plc was known by several other names during the Class Period prior to 2001, including Coats Patons plc (1961 to 1986) and Coats Viyella plc (1986 to 2001) before being renamed Coats plc in 2001.  Coats is the second largest manufacturer of zippers in the world (known in the United Kingdom as "zips"), sold under the Opti® and Opti-lon® brand and suitable for all kinds of industrial applications in the apparel and specialty sectors.  The Coats Group also claims to be the fastest growing zipper manufacturer in the world.  During the Class Period, Coats plc and its predecessor entities manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States and 67 countries throughout the world, either directly or through its affiliated companies.

7

20.    Defendant Coats North America de Republica Dominicana, Inc. ("Coats North America") is a North Carolina corporation with its principal places of business located at 3430 Torington Way, Suite 301, Charlotte, North Carolina 28201 and 4135 South Stream Blvd., Charlotte, North Carolina 28277. Coats North America is a wholly-owned and controlled subsidiary of defendant Coats plc. During the Class Period, Coats North America manufactured, sold and/or distributed Fasteners and Zippers to customers throughout the United States, either directly or through its affiliated companies.

21.    Coats plc and Coats North America, together with their parents and numerous other subsidiaries not named as defendants here, will be referred to herein as "the Coats Group."

**The Scovill Defendant**

22.    Defendant Scovill Fasteners, Inc. ("Scovill") is a Delaware corporation founded in 1802 in Waterbury, Connecticut, which as of 1998 has had its principal place of business relocated to 1802 Scovill Drive, Clarkesville, Georgia 30523. During the Class Period, Scovill manufactured, sold and/or distributed Fasteners and Zippers under the DOT® brand to customers throughout the United States and the world.

23.    Scovill brands sold in the United States include Gripper®, DOT®, Lift-the-DOT®, Pull-the-DOT®, DuraMark®, Whispersnap™, Maxi-Snap™ and Might-Snap™.

## CO-CONSPIRATORS AND AGENTS

24.    Other natural persons, corporations, and entities not named as defendants herein, may have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

25.    Whenever in this Complaint reference is made to an act, statement, or transaction of business by any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted business by or through its directors, members, partners, officers, employees,

or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§15, 26.

27.     Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint: (a) defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; and/or (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

28.     This Court has in *personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of Fasteners and Zippers sold to purchasers in this district; (b) transacted business in Fasteners and Zippers and other products in this district; (c) maintains and has maintained continuous and systematic contacts with this district over a period of years; (d) has substantial aggregate contacts with the United States as a whole; and/or (e) has purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

29.     Alternatively, there is jurisdiction over foreign defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## FACTUAL ALLEGATIONS

### The Products and Market

30.     The Fasteners and Zippers market, as used herein, includes, but is not limited to, zippers, snap fasteners, open prong fasteners, capped fasteners, hooks and eyes, rivets, burrs, post or prong rings, boot hooks, eyelets, tack buttons, sockets, back-plates, studs, screw studs, posts, washers, grommets, caps, locking fasteners and "notions" or small items of numerous kinds and types (excluding needles) used for fastening materials together in a wide variety of products in the garment industry.

31.     Fasteners and Zippers are used primarily in the garment, apparel and footwear industries for the manufacture of clothes and shoes.

32.     Zip fasteners temporarily join two adjoining pieces of fabric. Snap fasteners area pair of interlocking discs commonly used in place of buttons to fasten clothing. Snaps can be attached to material by hammering, plying or sewing. For plying snap fasteners, there are special snap pliers. Other textile fasteners employ systems such as hook elements, mushroom elements and loop elements for the purpose of binding fabrics.

33.     Fastener and Zipper demand is driven by the industries in which they are applied, most notably the apparel industry.

34.     Zips, fasteners, buttons, etc. represent approximately 4% of the total apparel cost.

35.     The United States market for Fasteners and Zippers is estimated at over $600 million in annual sales.

### The EC Investigation

36.     On September 19, 2007, the European Commission ("EC") announced in a press release the results of a nearly six-year investigation into suspected anticompetitive conduct among the major manufacturers of Fasteners and Zippers in the world.

10

37.    The EC investigation uncovered a long-running, multifaceted international conspiracy to fix prices and allocate customers and markets worldwide.

38.    The EC began its investigation after "certain information had been brought to its attention."

39.    This information led the EC to conduct surprise inspections in November 2001 on the premises of several producers of "hard and soft haberdashery," known in the United States generally as "notions" or small items used for sewing garments and in the manufacture of apparel and footwear.

40.    These surprise inspections triggered applications by the Prym Group, the Coats Group and the YKK Group - the three largest manufacturers in the Fasteners and Zippers industry - for immunity or a reduction of fines under the EC's leniency program.

41.    The EC inspections uncovered evidence showing that the major companies in the industry joined together to illegally reduce competition in the market for "zip fasteners" (zippers) and "other fasteners," which the EC indicated was fastening devices other than zippers, such as snap buttons and rivets, and "their attaching machines."

42.    The EC imposed substantial fines totaling over 328 million euros ($456 million U.S. dollars) on defendants the Prym Group, the YKK Group, the Coats Group, and Scovill, as well as on unnamed co-conspirators A Raymond S.A.R.L., Berning & Soehne GmbH & Co. KG and the German trade association Fachverband Verbindungs-und Befestigungstechnik ("VBT"), for operating a cartel in Europe and worldwide.

43.    The EC's press release further noted that any person or firm damaged by the anticompetitive behavior described in the release may bring a private action for damages

"submitting elements of the published decision as evidence that the behavior took place and was illegal ..."

44.     The evidence of the international conspiracy was further confirmed by documents produced to the EC by the defendants during the investigation and by statements provided by the representatives of the three defendant leniency program applicants.

45.     The EC gathered evidence on a cartel operating in the industry with the purpose of fixing prices and allocating customers and markets "*on a worldwide level*." (Emphasis added.)

46.     The EC determined that high-ranking management, such as managing directors, sales directors and board members, participated in regular meetings and discussions with competitors during which the unlawful actions took place.

47.     The EC possesses evidence that the companies and these high-ranking managers were well aware that their behavior was illegal.

48.     Nothing in the EC disclosures of the cartel limited the operation of the cartel to Europe, but conversely indicated that an international cartel was operated by international companies.

49.     The Prym Group issued a Press Release on September 19, 2007 stating as follows: "The members of the board of management of the Prym Group in charge at the times of the cartels, who are no longer active in the Prym undertakings, have at all times *admitted the participation* and cooperated with the Commission in its investigations." (Emphasis added.)

50.     The European Commission's September 19, 2007 press release further stated that the Prym Group received full immunity from fines under the Commission's leniency program "in respect of the *worldwide cartel* on the markets for other fasteners and attaching machines," as

it was the first to provide information about the cartel for "other fasteners and their attaching machines." (Emphasis added.)

51.    EC Competition Commissioner Neelie Kroes stated that the conspiracy among these "major fastening technology producers" maintained artificial price levels and included agreements to allocate customers and markets.

52.    The three largest producers of Fasteners and Zippers in the world - the Prym Group, the YKK Group and the Coats Group - received complete or partial immunity and reduction of fines, meaning they effectively admitted the existence of the conspiracy, identified the participants in the conspiracy, provided evidence of the conspiracy and confessed to their own and their co-conspirators' participation in the unlawful conduct.

### The Operation of the Fasteners and Zippers Conspiracy That Affected the United States

53.    The combination or conspiracy began at least as early as 1977 when the Prym Group and the Coats Group, agreed to divide and share the whole haberdashery market between them.

54.    Thereafter, by 1991, the YKK Group and Scovill (based in the United States), and others not named as defendants herein, joined the combination and conspiracy.

55.    Pursuant to the combination and conspiracy, defendants agreed, *inter alia*, as follows:

    a.    to share the whole market for Fasteners and Zippers;

    b.    on coordinated price increases in annual "price rounds;"

    c.    to exchange price information and to discuss price increases; and

    d.    to fix prices on a product-by-product and country-by-country basis and allocated customers on a worldwide level.

56.     All of these actions were conducted as a part of an on-going, overarching, international conspiracy of decades-long duration, beginning in at least 1977 and continuing to date.

57.     No defendant ever withdrew from the conspiracy, and thus, all defendants are jointly and severally liable for all of the unlawful conduct under the antitrust laws.

### Industry Meetings

58.     Representatives of defendants have regularly met through such organizations as the German trade association Fachverband Verbindungs- and Befestigungstechnik ("VBT"), at which meetings the conspiracy was organized and operated.

59.     For example, the companies agreed, among other things, on coordinated price increases in annual "price rounds," in the framework of the work circles organized by VBT.

### Price Increases and Demand Declines

60.     Prices for Fasteners and Zippers have risen dramatically over the period of the alleged misconduct, beginning in the mid- 1970s and continuing until the present.

61.     In particular, in spite of a remarkable decline in demand since the mid-1990s, prices of Fasteners and Zippers have risen during the period since the mid-1990s by over 25 percent.

62.     Demand for Fasteners and Zippers has been declining for several years, which should have acted to restrain price increases or cause prices to fall. In addition, manufacturing productivity has risen significantly over that time period, making the products less costly to produce, which should also have forced prices to decline in a competitive market. Moreover, the rise in prices of Fasteners and Zippers exceeds the rise in prices of the principal manufacturing cost inputs.

63.    Instead of restrained price increases or falling prices as would be expected in a competitive market, prices for Fasteners and Zippers have, in fact, dramatically increased in light of the declining demand, increasing productivity and lack of increase of cost inputs of a magnitude that would explain such price increases.

**Other Structural Characteristics of the Industry**

64.    A number of structural characteristics of the Fasteners and Zippers industry facilitate the implementation and maintenance of the worldwide, horizontal conspiracy alleged herein.

65.    Fasteners and Zippers differ in material, color and tape pattern, but are essentially commodity-like products. Products come in standard sizes, which may vary by product type within the Fastener/Zipper group. Major suppliers advertise their products under standard trade names, suggesting that products are easily characterized in the market by material composition, design and function.

66.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

67.    Demand for Fasteners and Zippers in the United States has been in decline since at least 1995 by dramatic amounts. *See* U.S. Census Bureau's Annual Survey of Manufacturers, Cut and Sew Manufacturing 1993 to 2005. The apparel industry has seen production fall dramatically, with much of it being shipped overseas, especially following the passage of NAFTA and the WTO, which hastened the shift of clothing production overseas.

68.    Static or declining demand is another factor which makes the formation of a collusive arrangement more likely. With static or falling demand firms have a greater incentive to collude to avoid price competition.

69.     The Fastener and Zipper industry in the United States is highly concentrated, facilitating coordination of prices. Here there is control of a large share of production by a few players. YKK is the largest zipper manufacturer in the world with 50% of the worldwide market share. Coats is the second largest producer. Together with Prym, these three defendants alone exercise control of the Fasteners and Zippers market which far exceeds the United States Department of Justice's (DOJ) guidelines for a highly concentrated industry.

70.     High concentration facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor pricing and production of other cartel members.

71.     There appear to be few, if any, available substitutes for Fasteners and Zippers. When there are substitutes available, the effect of supra-competitive pricing is to induce switching by purchasers to substitute products. When no substitutes are available, cartel members can raise the price without purchasers being able to switch from the product. The lack of available substitutes for a product facilitates collusion among competitors.

72.     Fasteners and Zippers are sold to the apparel industry, where there are literally thousands of firms engaged in production at any point in time. In 2002, there were over 9,000 firms listed by the U.S. Census Bureau as being engaged in apparel manufacturing. Thus, there are many thousands of purchasers of Fasteners and Zippers.

73.     With many buyers, each of which constitutes a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing arrangements carries large penalties.

74.    Defendants all sell as horizontal competitors at the same wholesale and retail levels of distribution chain.  When sellers operate at different levels of the distribution chain, it is more difficult to monitor adherence to the cartel arrangement.  When sellers operate at the same level of the distribution chain, as in this industry, it is easier to monitor adherence to the arrangement.

75.    Defendants sell and plaintiff and members of the Class purchase Fasteners and Zippers primarily on the basis of price.  One defendant's Fasteners and Zippers are substitutable for another's.  As one supplier in this market describes it, when quality is good enough for garment uses across suppliers, then potential suppliers "can compete only on price."  Price is the most important competitive factor in Fasteners and Zippers, and the standardized nature of Fasteners and Zippers hinders substantial and material non-price competition.

## ANTITRUST INJURY

76.    The unlawful contract, combination or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.    Prices charged by defendants and their co-conspirators to plaintiff and the members of Class for Fasteners and Zippers were maintained at artificially high and noncompetitive levels;

b.    Plaintiff and members of the Class were required to pay more for Fasteners and Zippers than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful conduct; and

c.    Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Fasteners and Zippers.

77. During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased Fasteners and Zippers from one or more defendants.

78. Plaintiff and the other Class members paid more for Fasteners and Zippers than they would have paid under conditions of free and open competition.

79. As a direct and proximate result of the illegal contract combination or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

80. Plaintiff and the members of the Class have suffered antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

81. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

82. Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities which purchased Fasteners and Zippers in the United States directly from defendants or their unnamed co-conspirators from January 1, 1977 to date. Excluded from the Class are defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates, and government entities.

83. Plaintiff brings this action on its own behalf and as a class action under Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

84. Due to the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands, the exact number and identities being known to defendants.

85.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

86.    Class members are identifiable from information and records in the possession of defendants.

87.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

a.    Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices for Fasteners and Zippers sold in the United States;

b.    The identity of participants in the conspiracy;

c.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in the furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f.    The effect of defendants' conspiracy on the prices of Fasteners and Zippers sold in the United States during the Class Period; and

g.    The appropriate measure of damages sustained by plaintiff and other members of the Class.

19

88.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff purchased Fasteners and Zippers directly from one or more of the defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

89.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

90.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

**EQUITABLE TOLLING**

92.     Throughout the conspiracy, defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from plaintiff. Defendants and their co-conspirators

20

conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.

93.    Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.

94.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

### INTERSTATE TRADE AND COMMERCE

95.    The conduct of defendants and their co-conspirators has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*:

a.    Defendants and their co-conspirators have sold Fasteners and Zippers throughout the United States;

b.    Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell Fasteners and Zippers throughout the United States;

c.    In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications; and

d.    The conspiracy alleged herein has affected millions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF

## (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

96.    Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

97.    From a date unknown, but beginning at least as early as January 1, 1977, and continuing to date, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

98.    In furtherance of the unlawful conspiracy, upon information and belief, each of defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of Fasteners and Zippers sold in the United States;

    b.    communicating with co-conspirators regarding prices to be charged for Fasteners and Zippers;

    c.    meeting with co-conspirators in secret in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein;

    d.    refraining from competing by refusing to offer Fasteners and Zippers at prices below the agreed-upon fixed price;

    e.    agreeing to allocate customers;

    f.    agreeing to allocate geographic markets; and

    g.    agreeing to allocate product markets.

99.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of Fasteners and Zippers sold in the United States and throughout the world.

22

100.    Defendants' anti-competitive agreement was implemented by, inter alia, coordinated price increases, with the actual and intended result that plaintiff and members of the Class paid supra-competitive prices for Fasteners and Zippers. As a direct and proximate result of the conspiracy, defendants have restrained competition in the Fasteners and Zippers market and injured plaintiff and each Class member in their business and property in that they have each paid a higher price for Fasteners and Zippers than they would have paid absent the concerted unlawful activity.

101.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

102.    The conduct of defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, plaintiff petitions that:

A.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the Class.

B.    The contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class

as allowed by law, together with the costs of the action, including reasonable attorneys' fees, and pre and post judgment interest.

D.    Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

a.    Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

b.    Communicating with any other person engaged in manufacture, distribution or sale of Fasteners and Zippers except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.    Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff hereby demands

a jury trial on all issues triable by a jury.

Dated: January 16, 2008

Respectfully submitted,

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

By: _____

Ronald J. Aranoff (RA-4690)
10 East 40th Street-22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Fax: (212) 779-3218
Email: aranoff@bernlieb.com

*Attorneys for Plaintiff*